[Civ. No. 5273.   First Appellate District, Division Two.—December 29, 1925.]

## N. R. VAIL et al., Plaintiffs and Respondents, v. PACIFIC FISH PRODUCTS COMPANY (a Corporation) et al., Defendants and Appellants.

[1] PARTNERSHIP—ACTION FOR MONEY—CROSS-COMPLAINT FOR ACCOUNTING—ISSUES—FIDUCIARY RELATIONSHIP—EVIDENCE.—In this action for moneys laid out and expended for the defendants, in which the latter, among other defenses, interposed a separate defense to the effect that the subject matter of certain counts of the complaint was a part of a larger transaction, to wit, a copartnership enterprise between plaintiffs and defendants, as to which no accounting had been had, and defendants by cross-complaint having sought such accounting, and counsel for the parties having stipulated that the special issue as to the existence of said alleged partnership and in the absence of an accounting should be tried by the trial court sitting without a jury and before calling a jury to try the other issues, the trial court should not have interrupted defendants in the introduction of evidence addressed to such special issue until a full and complete hearing had been had thereon, particularly where the evidence introduced by defendants prior to such interruption showed the existence of a fiduciary relation between plaintiffs and defendants and, further, that the recovery of a substantial amount of plaintiffs' advances was contingent on the success of the enterprise, which result could not be known until an accounting was had.

[2] ID. — NONSUIT — PREMATURE JUDGMENT. — In such action, in determining whether the evidence introduced by defendants was sufficient to support the allegations of their special defense and cross-complaint based on the alleged existence of a partnership, such evidence should have been taken most strongly in favor of defendants; and conceding that the evidence introduced at the time of the interruption did not show the parties to be partners, the court erred in determining that the parties were not partners, and thereupon proceeding to hear the evidence on the issues presented by plaintiffs' complaint, before all the evidence of defendants on the issue of the relationship of the parties had been introduced.

[3] ID.—TRUST RELATIONSHIP—JOINT ADVENTURE.—The fact that defendants in said action asked relief on the theory that the parties were partners did not preclude the trial court from giving them

3.  See 14 Cal. Jur. 760, 768, and Supplement.

relief .on the theory that the parties were joint adventurers, a relationship which is sometimes designated a limited partnership.

[4] ID.—ASCERTAINED BALANCES—RECOVERY IN ACTION AT LAW—INTERWOVEN TRANSACTIONS. — When balances have been completely ascertained an action at law can be maintained in some instances by the trustee or the beneficiary; but that rule can have no application to an action in three counts, two on promissory notes and the third for an unliquidated and unascertained amount, for moneys laid out and expended for defendants, each of which is but a part of a larger transaction between the parties, as to which defendants are seeking an accounting, and the subject matter of each of said counts is so interwoven with the main transaction that an action at law is not authorized until an accounting between the parties has been made.

[5] ID.—RELATIONSHIP OF PARTIES—EXPENDITURE OF MONEYS—GOOD FAITH—EVIDENCE.—Whether plaintiffs and defendants occupied the relation one to the other of trustee and beneficiary, partners or joint adventurers, the utmost good faith was required of plaintiffs in the expenditure of moneys for the account of the joint venture; and where plaintiffs established that certain moneys were actually paid out for the joint venture, and defendants did not introduce evidence showing any lack of the utmost good faith in making the payments, but merely claimed that the payments were made to certain officials for services which they asserted were never performed, the court could not say that any of such payments were not proper charges.

---

(1) 1 C. J., p. 612, n. 55; 4 C. J., p. 1201, n. 42.   (2) 33 C. J., p. 841, n. 4, p. 843, n. 22, 31, p. 844, n. 37, p. 845, n. 55, 61, p. 847, n. 5, p. 862, n. 55, p. 865, n. 19, p. 867, n. 40, p. 869, n. 90; 38 Cyc., p. 1551, n. 62, 63, p. 1553, n. 90.   (3) 33 C. J., p. 869, n. 86. (4) 1 C. J., p. 613, n. 62, p. 618, n. 14; 4 C. J., p. 521, n. 76, p. 532, n. 90; 33 C. J., p. 866, n. 37.   (5) 33 C. J., p. 851, n. 83, 84; 30 Cyc., p. 438, n. 79; 39 Cyc., p. 295, n. 10.

APPEALS from a judgment of the Superior Court of Los Angeles County. Charles Monroe, Judge. Reversed.

The facts are stated in the opinion of the court.

Stephens & Stephens for Plaintiffs and Appellants.

---

5. Mutual rights and liabilities of joint adventurers, note, 17 Ann. Cas. 1022; Ann. Cas. 1912C, 202; Ann. Cas. 1914C, 691; Ann. Cas. 1916A, 1210. See, also, 14 Cal. Jur. 763; 20 Cal. Jur. 729.

Kemp & Clewett and H. S. Clewett for Defendants and Appellants.

STURTEVANT, J.—The plaintiffs commenced an action against the defendants and alleged their claims in three common counts, each being for moneys laid out and expended for the defendants. The defendants answered, and in their answer first they denied each of the allegations contained in each count in the plaintiffs' complaint; second, to each count they interposed a separate defense to the effect that the subject matter of that particular count in plaintiffs' complaint was a part of a larger transaction, to wit, a copartnership enterprise between the plaintiffs and the defendants as copartners; third, the defendants pleaded a defense to the effect that the subject matter of all the counts contained in the plaintiffs' complaint was a part of the subject matter of a larger transaction, to wit, said copartnership, and pleaded the facts constituting the copartnership and the business transactions had thereunder down to the twenty-fourth day of December, 1918, at which time the copartnership was dissolved; that during the existence of said copartnership the plaintiffs received large sums of money for the account of the defendants and have refused to apply them as provided in the partnership agreement; and that an accounting should be had; fourth, defendants then pleaded seven counts against the plaintiffs, each being for a different claim for moneys alleged to be due and owing to the defendants by reason of transactions had between the parties under the alleged copartnership agreement. The defendants closed their answer with a prayer that an accounting be had, etc. The plaintiffs answered the cross-complaint and thereafter the cause came on for trial before the court sitting with a jury. The jury returned a general verdict and many special verdicts. The verdicts were incorporated in a judgment in favor of the plaintiffs and against the defendants in the sum of $16,086.30, from that judgment the defendants have appealed and have brought up a bill of exceptions.

From the same judgment the plaintiffs have appealed and have joined in bringing up the same record to support their appeal.

When the cause was called for trial it was stipulated between counsel that the special defense, to the effect that the plaintiffs and the defendants were copartners and that no accounting had ever been had, and that, therefore, no action could be maintained by one copartner against the other until such an accounting had first been had, should be tried by the trial court sitting without a jury and before calling a jury to try the other issues. Thereupon, the following documents, parts of which we have italicized, were offered and received in evidence:

### "Defendants' Exhibit No. 1.

"This agreement made this 17th day of March, 1917, by and between the Pacific Fish Products Company, a corporation organized and existing under and by virtue of the laws of the state of California, party of the first part, and N. R. Vail and W. D. Coberly, parties of the second part, witnesseth:

"That, whereas, *the party of the first part is the owner of the floating cannery John G. North,* owning the same free and clear of all encumbrances; and

"Whereas, the party of the first part agrees to furnish to the parties of the second part a good and sufficient surety bond in the sum of $10,000.00 for the faithful performance of this agreement; and

"Whereas, said ship has been fully equipped with all of the machinery and appliances necessary for canning the products to be obtained in the enterprise hereinafter provided for, which said equipment is owned by the party of the first part and is all fully paid for; and

"Whereas, the party of the first part is free of debt to any person or corporation; and

"Whereas, *the parties of the second part control the power schooner Vaquero:*

"Now, therefore, it is understood and agreed that:

"1st. Said floating cannery shall be towed to a point in Mexican waters to be selected by the parties hereto by the schooner Vaquero and there placed in operation and continued in operation at said point or at such other points as the parties hereto may agree upon, for the period of ten years from the date hereof, unless the enterprise be abandoned as hereinafter provided.

"2nd. *The parties of the second part hereby agree to deliver to the party of the first part sums up to ten thousand dollars ($10,000), said sums to be hereinafter designated as the Vail fund.* Said fund shall be paid to the party of the first part as needed for said enterprise such portions thereof as may be required for payroll and local expenses at the point of operation of the cannery, in cash, such portions thereof as may be required by furnishing transportation in and towage by said schooner Vaquero at the rates hereinafter provided, and also such portion thereof as may be required by the expenditure thereof, in the purchase of cans, labels, shook, supplies required in the operation of the cannery, and also a stock of merchandise and supplies to be used for trading purposes. All of said merchandise and supplies and those thereafter purchased for the party of the first part shall be billed to it at cost to the parties of the second part.

"3rd. *The parties of the second part agree during the term of this contract to transport upon said schooner Vaquero the cans, shook, supplies* and merchandise required in the enterprise, and the canned product, and the party of the first part agrees to deliver the same to said schooner for transportation upon the following basis:

"(a) While the operations of the cannery are conducted at a point no further distant from Port Los Angeles than Magdalena Bay, *the said Vaquero shall,* if such service is required by the cannery, *visit the cannery at least once every two weeks, and for the freight carried the party of the first part shall pay to the parties of the second part transportation charges as follows:*

"I.   For all northbound freight, at the rate of $10.00 per ton weight or measure (i. e., on the basis of weight of 2,000 pounds to the ton or on the basis of measurement treating 40 cubic feet as equivalent to a ton), the weight or measure basis as applied to the various classes of freight in each cargo shall be applied at the option of the parties of the second part.

"II.   For all southbound freight, at the rate of $9.00 per ton weight or measure defined and applied as aforesaid, provided, however, that the measure basis shall not apply

to empty cans or shook which are to be carried on a straight weight basis of $9.00 per ton.

"III.   If operations are carried on at a point further distant from Port Los Angeles than Magdalena Bay, the calls shall be made less frequently and the transportation charges shall be raised, all raises to be based upon the charges hereinbefore provided for, upon a fair pro rata increase.

"IV.   A charge of $1.00 per nautical mile shall be paid by the party of the first part to the parties of the second part for the towage of the cannery.     . .

" (b) *The title to all merchandise, supplies, canned product and freight delivered to said schooner Vaquero shall pass to parties of the second part as soon as it is so delivered,* whether it be the canned product to be carried on the northbound voyage, or whether it be the supplies, merchandise, etc., to be carried on the southbound voyage, but it is understood that the parties of the second part may from time to time waive the benefit of such arrangement for any definite period or periods, provided, however, it is understood and agreed that the parties of the second part are to be under no liabilities if loss or damage to any of said property results from fire, piracy, theft, riot, insurrection, the acts of God or the public enemy, or the perils of the sea.

" (c) It is understood and agreed by and between the parties hereto that the parties of the second part will cause all freights, both southbound and northbound, to be insured against marine loss and the premium on said insurance to be charged to operating costs of the enterprise.

" (d) The parties of the second part shall have the right to divert, from time to time, or permanently, from the enterprise the schooner Vaquero, if they provide during the period of diversion adequate means of transportation in lieu of the Vaquero.

"4th.   *The canned product* which the party of the first part agrees in every case to deliver to the parties of the second part for transportation northward, as aforesaid, *shall after its delivery into the United States, be sold by the parties of the second part,* using all reasonable diligence to obtain the highest market price and best advantage, and selling directly to brokers, or at the option of the parties of the second part, it may be delivered to Frank Van Camp of

Los Angeles, to be sold by him, *and the money as received* by the parties of the second part or the said Frank Van Camp, as the case may be, shall after the deduction of transportation charges due parties of the second part and subject to the provisions hereinafter made for certain cases, *be paid over to the treasury of the party of the first part.*

"*It is further agreed that all bills, invoices and vouchers and records of all parties are to be subject to the inspection of other parties hereto.*

"5th. After the delivery of the first pack to the parties of the second part and the transportation thereof to Port Los Angeles, the parties of the second part agree to loan and advance such further sums as may be required for the use of the enterprise up to the amount of $15,000, provided the value of the pack so delivered at Los Angeles is $15,000 or more; but if the value be less than $15,000 then the advances shall be only made up to the value thereof. *All returns derived from the sale of said pack and of all future packs shall be collected by and retained by the parties of the second part until such additional advance has been repaid with interest at the rate of 6% per annum.* The arrangement provided for in this paragraph may be renewed from time to time if the proper financing of the enterprise requires renewals.

"6th. *The net profits of the enterprise shall be divided between the parties hereto,* the party of the first part receiving two-thirds thereof and the parties of the second part receiving one-third thereof. The net profits shall be arrived at by ascertaining the gross receipts which shall consist of all money collected from all products sold, including the proceeds of the sales of merchandise from the cannery store, and from such total shall be deducted the cost of operation, which shall be made up of *a salary of $250 per month paid to J. E. Heston* while he acts as the manager of the cannery in the place of operation, *a salary of $150 per month to be paid to the said W. D. Coberly* while he is working for the enterprise, all wages paid to laborers and mechanics in the cannery and to fishermen, the sums paid for sea products, for merchandise, supplies and transportation and the cost of ordinary repairs to the appliances of the cannery, to be paid to local officials or authorities or to holders of fishing

concessions in Mexico and for dockage and premiums if any paid for insurance on the cannery, pack and supplies shipped, or any of them, and sums paid out in selling the pack, including payments to agents, jobbers or brokers as commissions if required.

"7th. *Before any net profits, however, are divided between the parties hereto, there shall be accumulated a fund of $10,000 hereinafter referred to as the 'working capital,'* which said fund, together with said Vail fund, shall be kept in the enterprise undistributed until the final liquidation of the enterprise. It is understood and agreed between the parties hereto that the $10,000 working capital provided for in this paragraph *shall be held in reserve for the purpose of purchasing additional equipment in the way of boats, barges, fishing equipment and gear* that may be needed in the further development of this enterprise to increase its output, it being understood that the title to such equipment shall be taken by the parties hereto as tenants in common, the one-third in the parties of the second part and the two-thirds in the party of the first part.

"8th. If at any time prior to the full term of this contract said enterprise proves a failure or it is demonstrated that a continued operation of the enterprise will result in a loss, either party hereto may require a liquidation of the enterprise and a termination of this agreement; and upon such liquidation the ship cannery, together with the equipment with which it is now equipped, shall be withdrawn from the enterprise by the party of the first part, and all of the other assets of the enterprise including the Vail fund, the working capital, the pack unsold, outstanding accounts, supplies, merchandise and extra equipment aside from the present equipment of the floating cannery, shall be divided between the parties hereto, the one-third thereof to the parties of the second part and the two-thirds to the party of the first part. In the event, however, that if when the time arrives for said division, the parties of the second part shall not have received by way of division of net profits a sum equal to the advancements made to said Vail fund, and have not received out of collections the further advances made against a pack, as provided for in paragraph 5 hereof, then in that event, before any division of assets is made, *said*

*additional advancements shall be fully repaid,* and the difference between the amount of said Vail fund and the amount, if any, received by the parties of the second part by way of net profits, shall be paid to the parties of the second part; and in any of such cases the parties of the second part shall have a lien upon all said assets and the right of possession thereof to convert said assets into money and apply the same to the satisfaction of such sums to which the parties of the second part are first entitled.

"9th. In the event that through the failure of the enterprise said Vail fund cannot be restored to the parties of the second part, either by way of net profits or as provided in the foregoing paragraph, *there shall be no liability on the party of the first part to repay the same.*

"10th. The party of the first part shall strictly comply with all pure food laws of the United States and with the various states of the Union in the canning and labeling of all sea food packed.

"11th. *It is understood and agreed that this arrangement shall not constitute the parties hereto partners in the said enterprise, or in any branch thereof.*

"12th. In the event that either party hereto is prevented or delayed in the performance of any condition, covenant or agreement herein contained by reason of strikes, boycott, fire, piracy, theft, riot, insurrection, the acts of God or the public enemy, or the perils of the sea, then such delay or prevention shall be excused.

"13th. It is further understood and agreed by and between the parties hereto that the party of the first part shall enjoy all privileges, rights and freedom of operation necessary or convenient in said enterprise under any concessions, licenses, privileges or grants from the Mexican government or authorities, or from the Cia Industrial Mexicana S. A. (a Mexican corporation), granted to the parties of the second part, or their agents, paying to the parties of the second part, however, the cost to the parties of the second part of said rights and the royalty accruing by reason of its operations to the grantor thereof, if any. In the event that the parties of the second part operate or authorize others to operate other enterprises under such rights a fair *pro rata*

charge based upon relative productions shall be made to the party of the first part.

"(Corporate Seal)           PACIFIC FISH PRODUCTS CO.

"By JOHN E. HESTON, Prest.

"STANLEY P. ALLEN, Secretary.

"N. R. VAIL.

"W. B. COBERLY.

"Defendants' Exhibit No. 2.

"This agreement, made this seventeenth day of March, 1917, by and between the Pacific Fish Products Company, a corporation organized and existing under and by virtue of the laws of the state of California, party of the first part, and N. R. Vail and W. B. Coberly, parties of the second part, witnesseth:

"That whereas the parties hereto are this day entering into a contract with respect to Mexican fishing, etc., now therefore, as part of the same transaction, it is understood and agreed:

"1st.  Parties of the second part shall have the right to withhold the schooner Vaquero, or any other vessel which they put into service for the transportation and towage provided in said contract, when they deem the political conditions locally in Mexico or international to be such as to make the voyage to Mexican waters dangerous or hazardous to the vessel in use or to be such as to lead the parties of the second part to believe that the voyage might result in the destruction, detention or confiscation of the vessel.

"2nd.  That the agreement of the parties of the second part contained in said contract to furnish transportation and towage is subject to the right of the parties of the second part to be relieved therefrom in case of the commandeering of the vessel in service by the government.

"3rd.  That all towage shall be done at the risk of the party of the first part.

"4th.  That the party of the first part is indebted to the Van Camp Sea Food Company in the sum of nine hundred thirty ($930.00) dollars.

"5th.  That instead of selling directly to brokers as provided in paragraph 4 of said contract, the parties of the second part may sell directly to the trade or through brokers. The brokerage (including any selling charge made by Frank

Van Camp or his corporation) shall be paid out of the proceeds of the sale.

"(Corporate Seal)      PACIFIC FISH PRODUCTS COMPANY.
              "By JOHN E. HESTON, Prest.
                  "STANLEY P. ALLEN, Sec'ty.
     "N. R. VAIL.
     "W. B. COBERLY.

"Defendants' Exhibit No. 3.

"This agreement made this 11th day of May, 1917, by and between the Pacific Fish Products Company, a corporation, party of the first part, and N. R. Vail and W. B. Coberly, parties of the second part.

"Witnesseth, that whereas on the 17th day of March, 1917, the parties hereto entered into a contract with respect to fishing operations.

"And whereas the parties of the second part claim to have loaned and delivered to the party of the first part sums in the form of money delivered, drafts paid, and supplies and equipment purchased and furnished all in addition to the $10,000 fund provided for in said contract, and the $3,000 note given to the parties of the second part on March 21st, 1917, which said excess is hereafter referred to as the 'Disputed fund,' which said disputed fund the parties of the second part claim is an obligation due and owing them from the party of the first part, but whereas the party of the first part claims that there is no obligation on which to repay said disputed fund, and the parties hereto desire to compromise their differences with respect to said disputed fund.

"And whereas funds are required to further prosecute the fishing and canning operations and it is desired to obtain more funds for said purpose.

"Now therefore it is agreed that the parties of the second part shall and do hereby extend to the party of the first part a credit of seven thousand dollars ($7,000) to be disbursed as hereinbefore provided and in consideration thereof the party of the first part delivers to the parties of the second part its promissory note bearing interest at the rate of six per cent per annum, payable at maturity, the principal of said note being payable at four months from this date; said credit shall be paid out by the parties of the second part, firstly in liquidation of outstanding accounts not yet

paid but incurred by the parties of the second part in the purchase of supplies for the cannery, and next to the payment of the now outstanding drafts drawn for the expenses of the cannery and then upon written orders or O. K. of any officer or director of the party of the first part in purchasing the supplies or equipment, furnishing transportation, obtaining boats and fishermen and in furnishing cash to J. E. Heston for the operation of the cannery and in purchasing equipment. All of said expenditures, payments and purchases, however, to be first subject to the approval of the parties of the second part or the approval of either of them.

"*Said W. B. Coberly shall forthwith proceed to the cannery and remain there and assist* in the attempt to fill the cans which are now there, and if when the said $7,000 credit has been exhausted the said Heston and Coberly shall reach the conclusion that the results at the cannery justify a further expenditure up to $3,000, the parties of the second part agree to extend a further credit and advancement to the party of the first part up to $3,000 to be expended and disbursed in the same manner as is herein provided for the expenditure and disbursement of said $7,000. *Provided, however, that there shall be no obligation on the party of the first part to repay said further credit up to said $3,000* except that the parties of the second part are hereby given a first claim and lien upon all packs from said cannery *until* said *$3,000 has been repaid out of the proceeds of packs,* and the parties of the second part are hereby authorized to apply the proceeds from the sale of packs as collected in liquidation of said further credit, together with interest thereon at the rate of six per cent per annum from dates of expenditure to date of payment.

"Similarly the parties of the second part may apply the proceeds of said sale to the payment of said $7,000 note or any portion or portions thereof.

"The date of maturity of said $3,000 note given March 21st, 1917, is hereby extended to date four months from the date of this agreement.

"In consideration of the premises said disputed account is hereby compromised upon the following basis:

"*The parties of the second part waive all claims against the party of the first part for the repayment thereof except*

*out of the proceeds of future packs* and the party of the first part gives to the parties of the second part a lien and charge upon future packs for the repayment of said disputed fund together with the right to apply the proceeds of future packs to their satisfaction thereof.

"(Corporate Seal Pacific Fish Products Company.)

"(Sgd.) PACIFIC FISH PRODUCTS COMPANY.

"FRANK VAN CAMP, V. P.

"STANLEY P. ALLEN, Secy.

"N. R. VAIL.

"W. B. COBERLY.

"Defendants' Exhibit No. 4.

"Dated December 20th, 1917.

"The Pacific Fish Products Company, party of the first part, and N. R. Vail and W. B. Coberly, parties of the second part, do hereby make the following amendments and additions to the contract between them dated March 17th, 1917, with respect to a fishing enterprise in Mexico:

"1 — It is agreed that the open account, with interest at six per cent (6%) per annum, of the party of the first part in favor of the parties of the second part, amounts to $4,631.76 over and above the $10,000.00 Vail fund referred to in the main contract.

"2 — It is further agreed that the equipment account for money expended in equipping the cannery, in favor of the parties of the second part amounts to $4,500.00 over and above the $10,000.00 Vail fund referred to in main contract, and open account above referred to.

"3 — The party of the first part agrees to execute and deliver to the parties of the second part, their promissory notes of $4,500.00 and $4,631.76, above referred to dated December 20th, 1917, and payable July 1st, 1918, bearing interest at the rate of 6% per annum upon the surrender to them of two promissory notes for $3,000.00 and $7,000.00 respectively, executed by first party and dated March 17th and May 11th, 1917. It being understood and agreed that the exchange of notes as herein stated shall take place as soon as it is ascertained that the floating cannery is to return to Mexico under this agreement.

"4 — The operations in the preparation of the cannery for the next season's pack are to be suspended until the par-

ties have been notified that a Mexican concession for next season's operation has been obtained.

"5 — The party of the first part agrees to finish the equipment of the floating cannery as soon as the concession above referred to is obtained, and the parties of the second part agree to advance the funds for same which is to be charged to the $20,000.00 account hereinafter provided for, *and the salaries of Coberly and Heston shall commence as soon as concession is granted.*

"6 — The parties of the second part hereby arrange a credit with the Vail Company of $20,000.00 in favor of the party of the first part; said sum to be disbursed, however, in the manner provided and for the purposes *provided in the main contract for the $10,000 Vail fund,* except that no expenditures shall be made by the Vail Company except upon the written order or O. K. of the party of the first part or one of its officers; and provided further that in all disbursements due care is to be exercised to make all purchases at the best market price and the same to be billed to first party at cost to second party.

"7 — The party of the first part hereby gives to the parties of the second part its promissory note in the sum of $20,000.00 to represent, and in consideration of the obtaining of such credit with the Vail Company. But in the event that the party of the first part should not use all of said credit, then the amount remaining thereof is to be paid over by the Vail Company to the parties of the second part and credited upon the $20,000.00 note. The $20,000.00 note is to bear interest at 6% per annum, and is to be payable on or before July 1st, 1918. But interest shall stop when partial payments are made thereon and interest shall only run on the items of payment out by Vail Company on account of said credit from the respective dates of payment.

"8 — As long as the cannery remains in operation upon a profitable basis of operation the parties of the second part agree from time to time to extend the payment of such notes during such period. But upon the termination of such operation and the liquidation of the enterprise whenever it should occur, the said notes shall, at the option of the parties of the second part, immediately mature, notwithstanding any previous extension thereof.

"9 — *First, the $4,531.76 open account note and, second the $4,500 note for the equipment account above mentioned, shall be repaid to the parties of the second part out of the first profits of future packs,* even though these profits are available before the date of maturity of the notes. But interest on the amount of the note so paid shall in each case cease to accrue. *In the event that the enterprise is abandoned at a future date, as provided in the main contract, then all outstanding accounts, money, packs and other assets of the party of the first part, other than the John G. North and its cannery equipment,* shall be applied as follows:

"1st — To the repayment of the $20,000.00 note or any part thereof then unpaid.

"2nd. — To the repayment of the open account note of $4,631.76, or any part thereof then unpaid.

"3rd — To the repayment of the Vail fund of $10,000.00.

"4th — To the payment of the equipment note of $4,500.00 above mentioned, or the balance thereof remaining unpaid. .

"10 — *But if the Vail fund cannot be repaid as provided in the preceding paragraph, or if the same be so paid only in part, then the party of the first part shall not be liable for its return and it shall be considered lost to the parties of the second part;* however, this does not relieve the party of the first part from any liability on their notes or other obligations excepting the Vail fund.

"11 — Frank Van Camp is hereby appointed by the parties of the second part as the exclusive selling broker for future packs, and he shall have the right to appoint subbrokers, and for his services, or for the services of the sub-brokers, as the case may be, he is to receive a total of 6% of the selling price which shall include all of his selling expenses of every character. And the party of the first part agrees on behalf of said Van Camp that he will faithfully, promptly and efficiently dispose of each pack, using all due diligence to obtain the best market therefor.

"12 — *The salary of W. B. Coberly, while he is engaged in assisting the enterprise, shall be the same as that of Heston, as provided in the main contract.* And in this connection it is understood and agreed that while operating

in Mexican waters, the said Heston shall have exclusive and final authority on all questions which relate to the catching of fish, the canning of the same and the operation of the cannery, and that while there Coberly will render such assistance to him as he may direct as said Coberly can furnish with due regard to the other duties of Coberly. *Coberly shall have the final and exclusive authority in dealing with the Mexican authorities and officials in all matters pertaining to imports and exports under the concessions* from the government.

"13 — It is understood and agreed that this agreement is made for the express purpose of going ahead with the enterprise; and if the concessions above referred to are not obtainable then this agreement, except as hereinafter provided, shall be deemed not to have been entered into and shall be null and void, and the rights of the parties and their respective obligations, whatever they may be, shall be as they exist on the date of this agreement and shall in no way be impaired or altered by this agreement.

"14 — The freight rate for operations carried on at San Lucas Bay shall be the same as that provided in the main contract for operations at Magdalena Bay, while the Vaquero is in the service, but not otherwise.

" (Ink addition) :

"14½ — It is further agreed to send a fishing-boat to Cape San Lucas, as soon as permit is granted, for the purpose of finding out whether fishing conditions there warrant the return of the floating cannery to Mexican waters.

"15 — The parties of the second part agree to loan immediately to the owners of at least five good fishing boats under contract with the party of the first part for fishing in the Mexican operations for next season, and also for United States operations for the period of one year, or to the end of the 1918 fishing season, the loans to be in no case in excess of $2500.00 on each boat with interest at 7% per annum unless the character of the boat and owner justifies, and the loans are to be secured by a mortgage as a first lien thereon. And the party of the first part is to procure for the parties of the second part insurance from the Tuna Packers Association to the limit of the said association, and in case the coverage under the

policy on any boat does not extend to the full amount of the loan, then any surplus above the insurance is hereby guaranteed by the stockholders of the party of the first part in proportion to their respective holdings of stock, all as set out following the names of each appended to this agreement. But if the loans on fishing boats or any of them herein provided for shall be made before the cancellation of this contract, as hereinbefore provided, nevertheless such cancellation shall not release the said guarantees; in such case the party of the first part agrees upon demand of the parties of the second part to transfer the fishing contract with such fishermen to the parties of the second part: All to the end that said loans shall be properly protected and the value thereof utilized.

"In witness whereof, the party of the first part has caused its corporate name seal to be hereunto affixed by its duly authorized officers, and the parties of the second part have hereunto set their hands the day and year first above written.

"THE PACIFIC FISH PRODUCTS COMPANY.

"By JOHN E. HESTON, Pres.

"Attest   STANLEY P. ALLEN, Secretary

"N. R. VAIL

"W. B. COBERLY

"The undersigned stockholders of the Pacific Fish Products Company, each owning and holding the number of shares of stock in said corporation set opposite his or its respective name, do hereby execute this agreement: 1st, for the purpose of approving and ratifying the same as such stockholders; and, 2nd, for the purpose of guaranteeing, in proportion to their respective holdings of stock, the surplus loans above the insurance on the boats, as provided in paragraph fifteen of this contract.

| | | |
|---|---|---|
| T. E. Heston ) | owning 180 shares of stock. | |
| John E. Heston ) | | |
| Douglas F. Allen ) | | |
|   by Stanley P. Allen ) | | |
|     Atty. in fact ) | 100 " " " | |
| Stanley P. Allen ) | | |
| Frank Van Camp ) | 220 " " " | |
|   for Van Camp Sea | | |
|   Food Co. | | |

"The undersigned, Stanley P. ·Allen, in consideration of the execution of the foregoing contract by the parties of the second part therein named, and for the purpose of introducing them so to do, does hereby guarantee that the said Douglas F. Allen, his son, will perform each and every obligation binding upon him by reason of the execu-, tion by the said corporation, of the foregoing contract and: any of the instruments therein referred to, and by reason' of the execution of the guaranty above mentioned with respect to fishing boats.

"Stanley P. Allen.

"Defendants' Exhibit No. 5.

"This agreement, made this 15th day of February, 1918, by and between Pacific Fish Products Company, party of the first part, and N. R. Vail and W. B. Coberly, parties of the second part,

"Witnesseth:

"That whereas the party of the first part requires more money for the contemplated voyage to Mexico for further fishing operations than the funds already provided, the parties of the second part lend to the party of the first part five thousand dollars ($5,000), and the party of the first part gives to the . parties of the second part its promissory note for such amount.

"And in the event that it shall be determined after operations in Mexico that the success of the packing operations justifies the parties of the second part in lending to the party of the first part a further sum, then in that event the parties of the second part agree to lend to the party of the first part a further sum up to 75% of the value of fish then actually in cans at the cannery or in transit, such sums to be used in the purchase of supplies, etc., and furnishing for transportation in the furtherance of the enterprise (ink addition) · such advances to take the place of loans provided for in main contract of May 17, 1917.

"It is agreed that the John G. North shall be towed to San Lucas Bay by the Northfork, on the basis of two hundred dollars ($200.00) per day for each day in excess of the average running time between Port ~~Los Angeles~~ San

Diego and Magdalena Bay, consumed in towing the John G. North to San Lucas Bay.

"The parties of the second part are directed to pay for such towage out of the consideration for the five thousand dollar ($5,000) note above mentioned.

"If there is any profit in the hauling of any return freight on the Northfork under an arrangement which may be made with the owner thereof for the return trip, the party of the first part shall have the benefit thereof.

"When the party of the first part has freight needed to be carried in the operation of the enterprise, it agrees to give to the parties of the second part at their Los Angeles office notification thereof and the quantity thereof, to the end that arrangements may be made or ships obtained to handle the same, within a reasonable time thereafter; but should the parties of the second part, in response to a request made by the party of the first part, furnish the Vaquero or any other vessel to carry freight, and should it occur that, by reason of the small amount thereof, either through miscalculation of the party of the first part or otherwise, there should be a loss to the parties of the second part upon the trip upon which such freight is carried, which loss would not have occurred had the freight both ways been adequate to fill the ship, then the party of the first part will stand the loss, the same to be charged as a cost and expense of the enterprise.

"(Corporate Seal)      PACIFIC FISH PRODUCTS Co.
"By JOHN E. HESTON, President.
"STANLEY P. ALLEN, Secretary.

"N. R. VAIL.
"W. B. COBERLY.
"By N. R. VAIL."

[1] In addition to the foregoing some correspondence was offered and received in evidence and thereupon the trial court read Defendants' Exhibits 1, 2, 3, 4, and 5, and then remarked, "I think I will not go any farther but simply hold that these people are not partners." Thereupon the defendants objected to the introduction of any evidence by the plaintiffs in support of their case because the agreement between the parties showed that they were copartners and no copartner can maintain an action against another until an accounting has been had. The defendants, for the same

reason, offered the same showing in support of a motion for judgment in favor of the defendants for costs. "The Court: The objection is overruled and your motion is denied." Thereafter the jury was called in and the court proceeded to hear the evidence on the issues presented by the plaintiffs' complaint and the answer of the defendants thereto. The first point assigned by the defendants is that the trial court erred in the rulings above set forth because the indentures quoted showed that the parties were partners. (*Chapman* v. *Hughes,* 104 Cal. 302 [37 Pac. 1048, 38 Pac. 109].) The plaintiffs have replied that under the facts the parties were not partners. (*Lyden* v. *Spohn-Patrick Co.,* 155 Cal. 177, 180 [100 Pac. 236].)

Although the respective contentions of counsel are interesting, we are not at liberty to pass on the question as to whether the parties were or were not partners. The cross-complainants were attempting to show that fact. They had introduced in that behalf only a part of their evidence. They were interrupted by the ruling of the trial court. Conceding that the evidence introduced at the time of the interruption did not show the parties to be partners, it cannot be known what relation would have been shown to exist when all of the evidence of the cross-complainants had been introduced. Moreover, assuming for the purposes of this decision, that such evidence would not have disclosed the relation to be that of partners, it does not follow that the cross-complainants should have been denied the relief which they were asking. [2] The evidence which had been introduced, weighed in the face of a motion for a nonsuit, must be taken most strongly in favor of the cross-complainants. (*Hoff* v. *Los Angeles Pacific Co.,* 158 Cal. 596 [112 Pac. 53].) As to whether it showed the relation to be that of partners we will concede at once is debatable. Nevertheless it showed the relation to be of a fiduciary nature. Again, conceding that the relation shown was not that of partners, as that expression is used in our statute (Civ. Code, sec. 2395 et seq.), there is yet another relation, that of joint adventure, which is sometimes designated a limited partnership. (*Keys* v. *Nims,* 43 Cal. App. 1 [184 Pac. 695]; 33 Cor. Jur. 839.) Many of the passages which we have italicized are the ordinary earmarks of a joint adventure contract. (33 Cor. Jur. 839, secs. 5, 6, 7, 12, 14, 16, 68, 79, 83, and 92.) [3] The fact

that the cross-complainants asked relief on the theory that the parties were partners did not preclude the trial court from giving them relief on the theory that the parties were joint adventurers. (*Butler* v. *Union Trust Co.*, 178 Cal. 195 [172 Pac. 601].) For the same reason that we may not at this time determine whether the relation existing between the parties was that of partnership, we cannot determine whether it was that of joint adventurers, nor can we determine that one party was acting as trustee for the other. The proof introduced by the appellants before they were interrupted tended to show that the plaintiffs were not entitled to recover all of their advances—that the recovery of a substantial amount of those advances was by the terms of the contracts contingent on the result of the success of the enterprise. That result could not be known till an accounting was had. If, on a full hearing, it transpired that an accounting should be had, then it follows that in the meantime no action at law should be maintained by the plaintiffs to recover those unascertained and unmeasured sums. As far as we are at liberty to go, in view of the condition of the record, is to state that the evidence which the cross-complainants had introduced was of such a nature that the hearing on the cross-complaint should not have been interrupted until a full and complete hearing had been had thereon. (*Butler* v. *Union Trust Co., supra.*)

[4] In what we have said we are not unmindful of the rule that when balances have been completely ascertained an action at law can be maintained in some instances by the trustee or the beneficiary. (2 Perry on Trusts, sec. 843; 33 Cor. Jur., p. 866, sec. 83; *Gleason* v. *White*, 34 Cal. 258.) And in this connection we have not overlooked the fact that the first and second counts of the plaintiff's complaint are each alleged to be evidenced by certain promissory notes. However, it will also be noted in this connection that each of those notes was but a part of a larger transaction and part of which is evidenced by defendants' exhibit number 5, *supra.* Moreover, the cross-complaint sought an accounting of all of the affairs between the parties. Assuming that each $5,000 promissory note constituted a rest or a balance, nevertheless it is equally clear that the third count was addressed to the unliquidated, unascertained, and unsettled larger portion of the account existing between the parties.

As the record stands the subject matter of the first count, of the second count and of the third count was so interwoven with the main transaction that at this time it appears that an action at law was probably not authorized until an accounting between the parties had first been had. (*Worms* v. *Lake,* 120 Misc. Rep. 210 [198 N. Y. Supp. 861].)

The most of the remaining points presented by the parties grow out of certain matters that arose by reason of instructing the jury. As we have held that the trial court should have heard the application of the cross-complainants for an accounting, it is not likely that the same questions will arise again. For that reason those points need not be determined at this time.

The record discloses that the parties disagreed in construing the written contracts which they had executed. One instance of disagreement arose as to the meaning of defendants' exhibit 5 in so far as it purports to state the compensation to be paid for towing the "John G. North" to San Lucas Bay. The paragraph in question contains an erasure. The erasure was not accounted for by either party. No evidence was offered regarding the circumstances that existed at the time the contract was written, and the record does not show from where the "John G. North" was to be towed. The trial court construed the contract as providing for towage from Port Los Angeles to Magdalena Bay. One party asserts that the name Los Angeles was stricken out and, consequently, the construction adopted by the trial court was error. The other party contends that the trial court inadvertently used the name "Los Angeles" when it should have used the name "San Diego." It is patent that this court cannot in this condition of the record ascertain the intentions of the parties if such intentions were different from those evidenced by the face of defendants' exhibit 5; nor can this court fully understand said passage in the absence of the information above referred to.

[5] Much of what we have said regarding the last item applies also to the items of expenditure which were made in payment of the alleged custom duties which the plaintiffs claim to have paid to a Mexican official and to the several items charged by the plaintiffs as salary paid to another Mexican official purporting to be for compensation for inspection by said official, but which services the defendants

claim were never rendered. We do not understand the defendants to claim that the moneys were not paid out. We do understand them to claim that the moneys were paid under such circumstances that said payments were ''purely gratuitous'' and therefore not chargeable against the defendants. (*Molloy* v. *Rourke*, 83 Conn. 196 [76 Atl. 517].) Whether the parties occupied the relation one to the other of trustee and beneficiary, partners, or joint adventurers, the utmost good faith is required of the trustee in whom confidence is reposed. (*Jones* v. *Kinney*, 146 Wis. 130 [Ann. Cas. 1912C, 200, 202, note, 131 N. W. 339]) ; but the appellants did not introduce evidence showing any lack of the utmost good faith by Mr. Coberly in making the payments. As the record stands, we cannot say that any of the payments made to Mexican officials were not proper charges in behalf of the plaintiffs.

The judgment is reversed; the defendants appealing to recover their costs.

Nourse, J., and Langdon, P. J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 25, 1926.